UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HALLMARK HEALTH SYSTEM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MICHAEL O. LEAVITT, Secretary, | ) | |
| U.S. Department of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR JUDICIAL REVIEW

### INTRODUCTION

The plaintiff, Hallmark Health System, Inc. ("Hallmark") seeks judicial review of a decision by the Provider Reimbursement Review Board ("Board" or "PRRB") upholding the denial by the Centers for Medicare & Medicaid Services ("CMS") of Hallmark's claim for reimbursement for a share of its costs incurred by direct graduate medical education ("GME" or "DGME") and indirect medical education ("IME"). A majority of the Board, one member dissenting, upheld CMS's denial of this reimbursement after a one day evidentiary hearing. Hallmark brings this action because the Board's decision was arbitrary, capricious, constituted an abuse of discretion, otherwise was not in accordance with law, was in violation of Hallmark's procedural and due process rights, and otherwise was unsupported by substantial evidence. Hallmark seeks an order reversing the Board's decision and directing CMS to award Hallmark its requested reimbursement for these costs.

PARTIES

1.     Hallmark is a 368-bed, non-profit, general acute care hospital located on four separate campuses in Everett, Malden, Melrose, and Medford in Massachusetts. Hallmark is a provider of services under Titles XVIII and XIX of the Social Security Act, as amended.

2.     The defendant Michael O. Leavitt ("the Secretary") is the Secretary of the United States Department of Health and Human Services ("HHS"), and in that capacity is responsible for HHS functions, including the operation of the medical insurance program established by Congress in Title XVIII of the Social Security Act, as amended, 42 U.S.C. §§ 1395, *et seq.* (the "Medicare Program"). He is named as a defendant herein in his official capacity. The Secretary has delegated responsibility for the administration of the Medicare Program to CMS and its Administrator.

JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395oo(f), 5 U.S.C. § 551 *et seq.*, Section 1878(f)(1) of the Social Security Act, and 28 U.S.C. § 1331.

4.     Venue lies in this district pursuant to 42 U.S.C. § 1395oo(f)(1).

GENERAL BACKGROUND

5.     Congress established the Medicare Program to ensure that the aged and disabled would have access to health care services. See 42 U.S.C. §§ 1395, *et seq.* Congress has determined that high quality residency education is fundamental to ensuring a physician workforce to serve this population. Under the Medicare Program, CMS, acting on the authority of the Secretary, reimburses qualifying health care providers for reasonable costs they incur in training medical residents. 42 U.S.C. §§ 1395ww(d)(5)(B) and (h); 42 C.F.R. §§ 412.105 and 413.86. CMS payment and audit functions under the Medicare program are contracted out to

insurance companies known as fiscal intermediaries ("Intermediary" or "Intermediaries").
Intermediaries determine payment amounts due to the providers under Medicare law and under
guidelines published by CMS. See, 42 U.S.C. § 1395(h), 42 C.F.R. §§ 413.20(b) and 413.24(b).

6.      The Medicare statute provides for two distinct payments for a teaching hospital's
share of costs associated with providing DGME and IME. The calculation for reimbursement
requires a determination of a teaching hospital's number of full-time equivalent ("FTE") residents
in training for a fiscal year. 42 U.S.C. §§ 1395ww(d)(5)(B) and (h); 42 C.F.R. §§ 412.105 and
413.86. The first Medicare payment is for costs of the residents' services, including the residents'
stipends, compensation paid to teachers, and other overhead costs of approved residency training
programs. See 42 U.S.C. § 1395ww(h); 42 C.F.R. §§ 413.86 and 413.85(d)(2)(ii) (2003). These
costs collectively are referred to as graduate medical education, or direct GME costs. The
Medicare payment for a teaching hospital's DGME costs is calculated based on a hospital-
specific rate per resident and the hospital's number of FTE residents in an approved program
during a fiscal year.

7.      The second Medicare payment is for higher-than-average operating costs per case
that are statistically correlated with the intensity of teaching in a hospital. 42 U.S.C. §
1395ww(d)(5)(B)(iv); 42 C.F.R. § 412.105. These higher-than-average operating costs are
called indirect medical education or IME costs. Medicare reimbursement for a teaching
hospital's IME costs is based on a hospital's number of Medicare patient discharges in a fiscal
year and the ratio of the hospital's number of FTE residents to its number of beds, which serves
as a proxy measure for teaching intensity. Id.

8.      Generally, the resident counts for DGME and IME are based on residents' time
worked in the hospital within the scope of an approved residency training program. 42 C.F.R. §§

412.105(f) and 413.86(f).  In addition, the Medicare statute provides that "all time spent" by a resident training under an approved program in a setting outside of a hospital "shall be counted" in the hospital's resident status for direct GME and IME if two conditions are met. 42 U.S.C. § 1395ww(h)(4)(E) (the "GME Statute"); 42 U.S.C. § 1395ww(d)(5)(B)(iv) (the "IME Statute"). First, the resident must be involved in patient care activities during his or her training in a non-hospital setting.  Second, the hospital must incur substantially all of the training costs in the non-hospital setting.

9.    Although Congress enacted the GME statute in 1986, and the statutory provision mandating the inclusion in GME resident count of all time spent in non-hospital settings became effective in 1987, the Secretary did not promulgate an implementing regulation until September 1989.  54 Fed. Reg. 40286 (Sep. 29, 1989).

10.    The 1989 regulation adopted a further requirement, beyond the statute's conditions, that "there is a written agreement between the hospital and the outside entity that states that the resident's compensation for training time spent outside of the hospital setting is to be paid by the hospital."  54 Fed. Reg. at 40317 (adopting 42 C.F.R. § 413.86(f)(1)(iii) (1989), currently designated as § 413.86(f)(3)(ii) (2003)).

11.    The Secretary has acknowledged this requirement was intended only "to provide an administrative tool for use by fiscal intermediaries to assist in determining whether hospitals would incur all or substantially all of the costs of the [residents'] training in the nonhospital setting."  69 Fed. Reg. 28195, 28315 (May 18, 2004).  The Secretary has also acknowledged that "the regulatory requirements concerning the written agreements may not have been the most efficient aid to fiscal intermediaries in determining whether hospitals would actually incur all or substantially all of the costs of the training programs in nonhospital settings."  Id. at 28316.  The

Secretary provided that "it would be more appropriate and less burdensome...if we instead focus the fiscal intermediaries' reviews on the statutory requirement that hospitals must incur all or substantially all of the costs of the program in the nonhospital setting." Id.

12.     In this case, the Intermediary excluded residents' training in a non-hospital settings from the resident counts that were used to determine Hallmark's GME and IME payments for the hospital's fiscal year ending September 30, 2001 ("fiscal year 2001") based on its belief that the Provider did not meet the written requirement of 42 C.F.R. § 413.86 and 42 C.F.R. §412.105. Hallmark timely appealed that determination to the Board.

13.     On November 7, 2006, the PRBB conducted a hearing on Hallmark's appeals for fiscal year 2001. The Board issued a decision dated October 16, 2007.

14.     Although incontrovertible evidence shows that Hallmark met each of the statutory and regulatory conditions for the mandatory inclusion of the residents' time worked in a non-hospital setting, the PRRB affirmed CMS' exclusion of reimbursement for the time spent by the dental practice residents in non-hospital settings. Hallmark Health System, Inc. (Everett, Malden, Melrose and Medford, MA.) v. BlueCross Blue Shield Association/National Government Services-Maine, Case No. 04-1796. The PRBB's decision constitutes the final decision of the Secretary as to the exclusion of the time spent by the dental practice residents in non-hospital settings fiscal year 2001. See 42 U.S.C. § 1395oo.

### ADMINISTRATIVE BACKGROUND

15.     The Secretary contracts with private organizations to perform certain audit, administrative, and payment functions under Part A of the Medicare Act. These organizations are referred to as "fiscal intermediaries" or "intermediaries."

16.    A hospital participating in the Medicare program is usually referred to, for Medicare reimbursement purposes, as a "provider of services," or a "provider." See 42 U.S.C. § 1395x(u).

17.    After the close of each fiscal year, a provider must file a cost report with its Medicare fiscal intermediary. 42 C.F.R. § 413.20(b). The intermediary audits the cost report and issues a final determination of the reimbursement due to the provider for services furnished to Medicare beneficiaries in a notice of program reimbursement ("NPR"). See 42 U.S.C. §§ 139h and 1395oo(a)(1)(i); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1803(a)(1); Bethesda Hospital Ass'n v. Bowen, 485 U.S. 309, 400-01 (1988).

18.    A provider is entitled to a hearing before the PRRB if it is dissatisfied with the intermediary's determination as to the amount of reimbursement due the provider for a fiscal year. 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835 and 405.1889.

19.    The Board's decision must be based upon the entire record of the hearing, including evidence not considered by the intermediary. 42 U.S.C. § 1395o(d); 42 C.F.R. § 405.1871(a).

20.    A provider that is dissatisfied with a final decision of the PRRB may appeal to this Court within 60 days after the provider receives notice of the final decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1877(a) and (f). Hallmark received notice of the final decision on October 16, 2007. This Complaint for Judicial Review is therefore timely.

21.    The Board's decision should be reversed because Hallmark has written agreements that satisfy the requirements of the Secretary's regulations and the uncontroverted evidence shows that Hallmark did incur substantially all of the costs of the residents' training in non-hospital settings and that residents did spend their time in patient care activities. The

Board's decision is not based upon substantial evidence in the record, and it is arbitrary, capricious and inconsistent with the plain meaning of the regulations the Board relied upon.

### FACTS SPECIFIC TO THIS CASE

22.    On September 28, 2001, Hallmark, as owner and operator of Lawrence Memorial and Malden Hospitals (the "Health System"), entered into a Memorandum of Understanding ("MOU") with Harvard University, on behalf of its School of Dental Medicine, and Tufts University, on behalf of its School of Dental Medicine (collectively, the "Schools") initiating a cooperative arrangement to provide graduate dental education and clinical training for dental residents, particularly to provide needed dental services to underserved populations. The MOU provided that the Health System agreed to incur specific costs of the Schools' graduate dental residency programs for the dental residents of the Schools who would be included in the Health System's cost report beginning with the cost report year ending September 30, 2001.

23.    On November 28, 2001, Hallmark entered into an Agreement between Hallmark and the Schools which expressly superseded the MOU dated September 28, 2001.

24.    During fiscal year 2001, Hallmark operated dental residency programs through an academic affiliation with the Schools and incurred approximately $1.2 million in costs of the Schools' graduate dental residency programs for the dental residents of the Schools who were to be included in the Health System's cost report beginning with the cost report year ending September 30, 2001.

25.    Hallmark included 65.82 GME and 70.32 IME dental resident FTEs on its cost report for fiscal year 2001. All of the FTEs included for the dental residents related to training in non-hospital settings.

26.     On or about September 3, 2003, Hallmark received notice from Associated

Hospital Services, 2 Gannet Drive, So. Portland, Maine (the "Intermediary") that all dental

residents would be eliminated from the resident count for Hallmark on audit.  The disallowance

was based on the mistaken belief that there was no written agreement covering the relevant time

period that stated that the resident's compensation for training time spent outside of the hospital

setting is to be paid by the hospital.

27.     On or about March 1, 2004, the Intermediary reviewed Hallmark's fiscal year

2001 cost report and incorporated the results of that review in its NPR for that fiscal year.

28.     Hallmark timely appealed from the NPR to the Board by a request for a hearing,

pursuant to 42 C.F.R. § 405.1835 and 42 C.F.R. § 405.1841, in a letter dated June 9, 2004.

29.     On July 8, 2004, Hallmark supplemented its request for hearing with calculations

of the reimbursement impact of the issues.

30.     On December 2, 2004, Hallmark served its Preliminary Position Paper on the

Intermediary.

31.     On February 2, 2005, the Intermediary served its Preliminary Position Paper on

the Provider.  In its Preliminary Position Paper, with respect to the dental resident issue, the

Intermediary argued only that the dental residents would be excluded because there was no

written agreement with the dental schools in place.  The Intermediary did not raise any additional

reasons for the disallowance.

32.     On February 28, 2005, Hallmark filed its original Final Position Paper with the

Board.

33.     On June 22, 2005, the PRBB provided a Notice of Hearing in the matter of

Hallmark Health System, Inc. (Everett, Malden, Melrose and Medford, MA.) v. BlueCross Blue

Shield Association/National Government Services-Maine, Case No. 04-1796. The hearing was scheduled in the appeal for December 13, 2005.

34.    On October 13, 2005, Hallmark timely served a Request for Documents and Interrogatories (collectively, "Discovery Requests") on the Intermediary, responses which were due November 14, 2005. The Discovery Requests included Document Request No. 4): "All documents concerning any instance where AHS allowed the inclusion of residents who performed work at nonprovider settings in a provider's DME and/or IME resident counts for all or part of a cost-reporting period, including but not limited to all written agreements between the provider and nonprovider" and Document Request No. 5): "All documents concerning any instance where AHS refused to allow the inclusion of residents who performed work at nonprovider settings in a provider's DME and/or IME resident counts for all or part of a cost-reporting period, including but not limited to all written agreements between the provider and nonprovider." The Discovery Requests also included Document Request No. 10): "Describe in detail any additional basis you intend to assert before the Board for exclusion of the dental residents from Hallmark Health's DME and IME resident counts for the reporting period ending September 30, 2001."

35.    On November 4, 2005, the Board issued noticed that the hearing had been re-scheduled for July 10, 2006.

36.    Hallmark received no response to either the Document Requests or Interrogatories, but instead received a letter from the Intermediary on November 30, 2005, two weeks after responses were due, requesting that Hallmark limit its Discovery Requests and choose to pursue its requests through FOIA. Hallmark promptly responded by letter on December 8, 2005 explaining to the Intermediary why it believed its Discovery Requests were

reasonable, and agreeing as a courtesy to limit the scope of its FOIA requests. The Intermediary responded on December 22, 2005, informing Hallmark that as it appeared Hallmark would be able to obtain the information it needed from its FOIA requests, the Intermediary had no plans to respond to either Hallmark's Request for Documents or Interrogatories. Hallmark wrote to the Intermediary on December 28, 2005, informing the Intermediary that Hallmark was not abandoning its Discovery Requests, and again, requesting that the Intermediary respond. Hallmark received no response from the Intermediary.

37.     On March 7, 2006, Hallmark again contacted the Intermediary to request responses to its Discovery Requests. On April 12, 2006, Hallmark sent another letter to the Intermediary requesting responses. The Intermediary responded on April 17, 2006 in a letter which did not address the request for responses to the Provider's Discovery Requests.

38.     On May 22, 2006, after months of repeated attempts, Hallmark filed a motion to the Board to compel the Intermediary to respond to its Discovery Requests and to request the hearing be rescheduled in order to give Hallmark adequate time to fully prepare its case.

39.     On June 1, 2006 the Board granted in part and denied in part Hallmark's motion. The Board denied Hallmark's request to compel production responsive to Document Requests 4 and 5 and denied Hallmark's request to postpone the hearing. The Board's order compelled the Intermediary to produce some of the requested discovery.

40.     On June 8, 2006, Hallmark requested that the Board reconsider its denial of Hallmark's request for certain discovery and postponement of the hearing so that Hallmark would be afforded an opportunity to prepare for the hearing in order to be able to present and defend its positions.

41.    On June 20, 2006, the Intermediary served responses to the Provider's First Set of Interrogatories, yet again articulating the same basis for disallowing the dental residents. In response to Interrogatory No. 10, which called for the Intermediary to "[d]escribe in detail any additional basis you intend to assert before the Board for the exclusion of the dental residents from Hallmark Health's DME and IME resident counts for the cost reporting period ending September 30, 2001," the Intermediary responded: "No other basis to date."

42.    The Intermediary never served a supplemental interrogatory response on the Provider.

43.    Hallmark wrote a letter to the Board on June 23, 2006 in which it stated its contention that the Intermediary's policy of requiring a written agreement between a provider and a non-provider be executed prior to the start of the cost reporting period was a *post hoc* policy that should not be applied to adjustment of Hallmark's cost report for 2001.

44.    On June 28, 2006, the Board issued a notice re-scheduling the hearing to November 7, 2006.

45.    On August 4, 2006, consistent with instructions from the Board, Hallmark served a second request for documents and interrogatories on the Intermediary to which the Intermediary responded on September 8, 2006.

46.    On August 17, 2006, the Intermediary served a request for documents and interrogatories on Hallmark to which Hallmark timely responded on September 18, 2006 and October 3, 2006.

47.    Hallmark timely submitted its witness list on October 6, 2006.

48.    On October 20, 2006, Hallmark proposed a stipulation of facts to the Intermediary.

49.    On October 23, 2006, after years of providing the date of the written agreement as its sole basis for excluding the dental residents from the Provider's DME and IME counts on its 2001 Cost Report, the Intermediary introduced in its Revised Final Position Paper (dated October 25, 2006) to the Board numerous additional putative bases for the disallowance of the inclusion of dental residents in the Provider's DME and IME resident counts for the cost reporting period ending September 30, 2001.

50.    In this filing, the Intermediary acknowledged that at the time of the audit, dental residents were disallowed due to the agreement not being signed prior to the start of the dental residents rotating to offsite locations, but asserted that after further review, it now had additional reasons to support its decision.

51.    The additional reasons the Intermediary argued the dental residents should be disallowed included: 1) the MOU does not include resident activities as required by the regulation; 2) the Intermediary questioned the reasonableness of the costs paid by the Provider to the dental schools; 3) the MOU is not a binding written agreement; 4) the Provider had not reasonably documented the dental residents' rotations; and 5) the Provider may be prohibited from counting the dental residents if it is revealed at the hearing that other entities first incurred the training costs.

52.    On October 24, 2006, Hallmark filed a Motion to Exclude from the Hearing Newly Raised Bases for Disallowing Residents.

53.    In the Motion to Exclude from the Hearing Newly Raised Bases for Disallowing Residents, Hallmark argued that not only had the Intermediary failed to articulate any reason other than the date of the written agreement for the previous three years, but it failed to identify any other reason when specifically asked the question by Hallmark in an interrogatory served

only four months prior.  Hallmark explained to the Board that it had propounded that interrogatory to avoid being blindsided on the eve of the hearing.

54.    On October 30, 2006, the Board denied Hallmark's request for an order to exclude the Intermediary's newly raised bases for disallowing residents.

55.    The hearing was conducted on November 7, 2006.  The record established there were three issues to be determined involving 1) Medicare bad debts; 2) disproportionate share hospital payments and 3) the determination of Hallmark's dental resident count for purposes of calculating its direct and indirect graduate medical education ("GME") payment.

56.    At the hearing, Hallmark renewed its request to the Board to exclude evidence related to the newly raised bases for disallowing residents or, in the alternative, to order the matter to be remanded to allow Hallmark sufficient time for preparation.

57.    At the hearing, the parties entered into the record a stipulation of facts that effectively resolved the Medicare bad debt and disproportionate share hospital payment issues.

58.    The hearing proceeded with testimony and arguments addressed solely to the dental resident count issue.  Hallmark submitted testimony and other evidence to demonstrate that the Intermediary's disallowance of dental residents in training at the Schools was improper because Hallmark had complied with the Medicare regulations governing the ability of a hospital to claim residents in training at non-hospital sites.

59.    The Intermediary improperly raised a number of new questions relating to the dental resident count issue immediately before and during the hearing in violation of Hallmark's substantial rights.  Without adequate notice of the Intermediary's arguments, Hallmark was denied an effective opportunity to defend itself and present its arguments.  The Board's allowance of these questions substantially prejudiced Hallmark in the hearing.

10815773_3.DOC                                    -13-

60.    At the close of the hearing, the Board invited both parties to submit their closing statements in Post-Hearing Briefs. In response to the Board's direction, Hallmark submitted a Post-Hearing Brief on January 12, 2007.

61.    The PRBB issued a decision on October 16, 2007. The Board majority ruled that there are four Medicare regulatory requirements for claiming the time spent by dental residents in rotations at non-hospital sites as set forth in 42 C.F.R. § 413.86(f) and 42 C.F.R. § 412.105(f)(1)(ii)(C) which must be met by the Provider in order for it to claim the residents in question.

62.    The first criterion, that the residents be trained in an approved training program, was not challenged by the Intermediary. The Board determined that Hallmark met that criterion.

63.    The second criterion, that the resident spends his or her time in patient care activities, was challenged by the Intermediary. The Board incorrectly determined that Hallmark had not met the criterion.

64.    The third criterion, that the written agreement between the hospital and the nonhospital site must indicate that the hospital will incur the cost of the resident's salary and fringe benefits while the resident is training in the nonhospital site and the hospital is providing reasonable compensation to the nonhospital site for supervisory teaching activities, was challenged by the Intermediary. The Board incorrectly determined that Hallmark had not met that criterion.

65.    The fourth criterion, that the hospital must incur all or substantially all of the costs for the training program in the nonhospital setting, was challenged by the Intermediary. The Board incorrectly determined that Hallmark had not met that criterion.

## REASONS WHY THE DECISION SHOULD BE REVERSED

66.    The PRBB's decision must be reversed because it rests first on the presumption that the regulation's written agreement requirement was not met.  Hallmark and the Schools in fact entered into two separate agreements: 1) the summary MOU dated September 28, 2001, and 2) the more comprehensive GME Agreement dated November 29, 2001.  The MOU was a binding legal agreement that governed the relationship between the parties until superseded by the equally binding GME Agreement.  The MOU and the GME Agreement independently met all of the written agreement criteria of 42 C.F.R. § 413.86(f)(4)(ii).  The Board's decision to the contrary is not based upon substantial evidence in the record.  A written agreement was in place both with the execution of the MOU and later, with the GME Agreement.  The Board's decision was arbitrary, capricious and inconsistent with, and constitutes an unexplained departure from, basic contract law.

67.    The PRBB's decision also incorrectly presumes that the residents were not involved in patient care activities during their training at the Schools.  Dental residents training at the Schools spent their time in patient care activities consistent with the regulations as interpreted by CMS.  The specific activities of the dental residents were well documented in supporting documentation.  The Board's decision to the contrary is arbitrary and capricious because it is not based upon substantial evidence in the record which establishes that the dental residents were involved in patient care activities during their training.

68.    The PRBB's decision also incorrectly presumed that Hallmark did not incur "all or substantially all of the costs" in connection with the training of the dental residents at the Schools.  The costs that must be borne by the hospital are specifically defined by the Medicare GME regulation to include only resident salaries and fringe benefits and the portion of faculty

salaries and fringe benefits attributable to GME. Consistent with regulatory requirements, Hallmark was required to reimburse the Schools for these costs and incontrovertible evidence demonstrates that these amounts were paid. The Board's decision to the contrary is arbitrary and capricious because it is not based upon substantial evidence in the record, which established Hallmark incurred all or substantially all of the costs.

69.     The PRBB's decision also was made in disregard to certain due process requirements which are imposed upon administrative agencies and, as such, is a violation of Hallmark's procedural rights. The PRBB Instructions require that the Federal Rules of Civil Procedure guide the Board and that parties are obliged to provide relevant material early. The Board, however, violated this principle and its own regulations when it refused to allow Hallmark's timely Discovery Requests for relevant materials central to resolving the issues at hand. Further, the limited notice provided to Hallmark when the Intermediary raised a number of new questions relating to the dental resident count issue immediately before and during the hearing could not be and was not cured by the Board's decision to allow Hallmark to file a Post-Hearing Brief. The Board's refusal to allow Hallmark to adequately prepare for the hearing and its allowance of the Intermediary's untimely arguments at the hearing substantially prejudiced Hallmark. The Board's failure to ensure that Hallmark's rights to a meaningful opportunity to be heard were met directly and substantially affected the Board's substantive decision and, as such, the Board's decision is further arbitrary, capricious, and an abuse of discretion.

COUNT I

70.     Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

71.    The PRBB's decision should be reversed pursuant to 42 U.S.C. § 1395ww(h)(4)(e) because it is arbitrary.

## COUNT II

72.    Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

73.    The PRBB's decision should be reversed pursuant to 42 U.S.C. § 1395ww(h)(4)(e) because it is capricious.

## COUNT III

74.    Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

75.    The PRBB's decision should be reversed pursuant to 42 U.S.C. § 1395ww(h)(4)(e) because it is an abuse of discretion.

## COUNT IV

76.    Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

77.    The PRBB's decision should be reversed pursuant to 42 U.S.C. § 1395ww(h)(4)(e) because it is not and was not rendered in accordance with the law.

## COUNT V

78.    Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

79.    The PRBB's decision should be reversed pursuant to 42 U.S.C. § 1395ww(h)(4)(e) because it is unsupported by substantial evidence.

## COUNT VI

80.    Hallmark restates and incorporates by reference the allegations set forth in the preceding paragraphs.

81.    The PRBB's decision should be vacated as ultra vires insofar as it was reached in violation of Hallmark's due process rights.

WHEREFORE, Hallmark respectfully requests the following relief:

1.  That the Court reverse the PRBB's decision and remand this matter to Defendant with instructions to reimburse Hallmark for the costs it incurred for residents that are associated with resident time at the Universities;

2.  That Hallmark be awarded prejudgment interest, pursuant to 42 U.S.C. § 1395oo(f)(2) and 42 C.F.R. § 413.64(j), the common law, and all other applicable laws, statutes, and regulations;

3.  That Hallmark be awarded its attorney's fees and costs; and

4.  For such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Kevin Post
(D.C. Bar No. 502119)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC  20005-3948
Tel: 202-508-4600
Fax: 202-508-4650

Dated:  December 14, 2007

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

HALLMARK HEALTH SYSTEMS, INC.

## DEFENDANTS

MICHAEL O. LEAVITT, Secretary, Department of Health and Human Services

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Middlesex, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kevin J. Post
Ropes & Gray LLP
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 20005-3948
Tel: 202-508-4600

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government Plaintiff

O  3 Federal Question (U.S. Government Not a Party)

⦿  2 U.S. Government Defendant

O  4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

O  **A. Antitrust**

☐ 410 Antitrust

O  **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

⦿  **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

O  **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O  **E. General Civil (Other)**    OR    O  **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans**<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>(if Voting Rights Act) |

**V. ORIGIN**

● 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

42 U.S.C. §§ 1395, et. seq.   Judicial review of decision by Provider Reimbursement Review Board

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $** As specified    Check YES only if demanded in complain **JURY DEMAND:** YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 12/14/2007    SIGNATURE OF ATTORNEY OF RECORD _(signature)_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.